# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JANE SIMPSON, on Behalf of Herself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>CITIZENS BANK,<br><br>      Defendant. | Case No. 2:12-cv-10267-DPH-RSW<br><br>Hon. Denise Page Hood<br><br>Magistrate Judge R. Steven Whalen |
| SHIRLEY D. LIDDELL, on Behalf of Herself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>CITIZENS BANK and CITIZENS REPUBLIC BANCORP, INC.,<br><br>      Defendants. | Case No. 2:12-cv-11604-DPH-RSW<br><br>Hon. Denise Page Hood<br><br>Magistrate Judge R. Steven Whalen |

**DECLARATION OF ARTHUR OLSEN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT WITH CITIZENS REPUBLIC BANCORP**

**Summary of My General Qualifications**

1.  I have over 15 years of professional information technology experience, specializing in the areas of database development, database administration and database support. I have received extensive training related to Oracle Corporation ("Oracle") database software in the areas of relational database design, architecture and administration, as well as SQL and PL/SQL, application tuning, database tuning and advanced database concepts. I was also trained by Microsoft Corporation ("Microsoft") in database architecture and administration, database tuning and TSQL.

1

2. For three years, I worked as a database engineer for Microsoft where my responsibilities primarily involved database design and administration. Among other duties at Microsoft, I participated in the design, implementation and support of an extensive data warehousing solution for Microsoft's licensing division, and managed and supported numerous databases throughout the company. I received multiple awards and recognitions from Microsoft for my database-related work at the company.

3. In addition to my experience working for Microsoft, I worked for six years at Hewlett-Packard Company ("Hewlett-Packard") as a database engineer. Among other responsibilities at Hewlett-Packard, I served as the primary database administrator for both Oracle and SQL Server systems that supported multiple divisions. My responsibilities at Hewlett-Packard also included serving as lead analyst in charge of compiling, analyzing and processing data from various internal database systems throughout the company for use in litigation support.

4. In addition to my work for Microsoft and Hewlett-Packard, I have provided database services to a number of other large corporations, including Cisco Systems, Inc. My responsibilities in that regard have included utilizing database systems for financial reporting services. I have also managed the development of data integration solutions for small to mid-size companies, and developed a solution for integrating an automated process for the calculation of inventory reserves with Oracle Financials.

5. My qualifications and background are set forth in more detail in my consultant profile, which is attached hereto as Exhibit A.

6. In addition to my general qualifications set forth above and in the attached consultant profile, I have specific experience that is directly relevant to my assignments

2

in this litigation. I was retained by plaintiffs as a consultant and expert in the case *Gutierrez v. Wells Fargo Bank, N.A.*, Case No. 07-05923WHA (N.D. Cal.) ("*Gutierrez*"), a class action brought on behalf of Wells Fargo California customers challenging Wells Fargo's high-to-low re-sequencing practices. Similar to my assignment here, in *Gutierrez* I was asked to review and analyze the historical transactional data maintained by Wells Fargo, and to provide my opinion regarding the feasibility of using such data to recreate alternative posting orders for the customers' transactions (i.e., where the same transactions are sequenced in a different order than the order in which the bank actually posted them) for the purpose of comparing the number of overdraft charges Wells Fargo assessed each customer pursuant to its actual posting order with the number of overdraft charges Wells Fargo would have assessed had the alternative posting order been used. Having determined that it was, in fact, feasible to do so on an automated basis using the available data, I was ultimately asked to perform calculations using class-wide data to: (a) identify the Wells Fargo California customers who were assessed additional overdraft fees due to Wells Fargo's high-to-low posting order (as compared with certain alternative posting orders) during the class period in that case (November 15, 2004 through June 30, 2008); and (b) calculate the amount of the additional overdraft charges each such customer was charged during that time period.

7. After I completed my comprehensive analysis and it was provided to Wells Fargo in advance of trial, Wells Fargo sought to exclude my analysis from trial, submitting competing expert testimony and raising various challenges to my qualifications and the methodology that I used to perform my analysis. Judge William H. Alsup, who presided over *Gutierrez,* rejected Wells Fargo's attacks on my methodology

3

and found that, given my background and experience, I was "clearly qualified to perform" the tasks I was asked to perform.

8. I presented my comprehensive analysis at the *Gutierrez* bench trial on April 29, 2010. I was subjected to cross-examination by Wells Fargo's counsel during the trial. Moreover, Wells Fargo presented competing testimony from its own experts who attempted to challenge my methodology and the reliability of my results. After trial, Wells Fargo submitted proposed findings to the Court. In its proposed findings, Wells Fargo again sought to discredit my analysis and the methodology that I used.

9. On August 10, 2010, Judge Alsup issued his findings after the *Gutierrez* bench trial. Judge Alsup found that I did "a professional and careful job in laying out the impacts of various alternative posting protocols," and adopted one of my analyses as the basis for his $203 million class restitution award.

10. In addition to my work in the *Gutierrez* case, I have performed similar work in several other cases during the past three years. Among other things, I have analyzed the historical transactional data maintained by a number of other defendant banks to determine the feasibility of identifying the customers affected by those banks' debit card sequencing practices and the amount of such harm, have conducted damages analysis, and submitted numerous declarations in those cases supporting motions for class certification and/or settlements.

**Scope of My Assignments in This Litigation**

11. Class counsel retained me to perform data extraction, data analysis and damage calculations in order to assist in the settlement negotiations and effectuation of

4

the class action settlement ("Settlement") with defendant Citizens Republic Bancorp, Inc., ("Citizens").

12. The scope of my assignments were to: (1) determine whether it was possible, using historical customer data maintained by Citizens, to identify on a class-wide basis Citizens consumer accounts affected by high-to-low debit card sequencing and to calculate each such account's corresponding harm; and (2) review and analyze historical customer transactional data that Citizens has maintained for the Settlement class period in order to effectuate the Settlement by (a) identifying those Citizens consumer accounts that were assessed additional overdraft fees as a result of the practice of posting debit card transactions in the order of high-to-low in dollar amount instead of in low-to-high order, and (b) calculating the amount of corresponding harm each such consumer account incurred as a result of such practice.

**Use of Historical Data to Determine Affected Accounts on a Class-Wide Basis**

13. In March 2013, I was asked by class counsel to embark on the assignment described above (i.e., identify Citizens consumer accounts that paid additional overdraft fees as a result of high-to-low debit-card transaction sequencing and calculate each such account's corresponding harm). After conferring with class counsel, I received and reviewed several preliminary documents that were produced by Citizens.

14. Based on the review of the preliminary documents and conversations with the bank, I determined that Citizens maintained data sufficient to perform a class-wide analysis to identify which accounts were charged additional overdraft fees as a result of high-to-low debit card sequencing and calculate each such account's corresponding harm.

**Analysis of Data to Effectuate the Settlement**

15. As set forth in more detail below, between May 2013 and August 2013, my associate Ed Hamilton (who works under my direct supervision) and I spent approximately 250 hours working with the Citizens data. Through that analysis, I was able to determine that the data maintained by Citizens was sufficient to make the required calculations, and thereafter I performed the full analysis in order to identify the accounts that were charged additional overdraft fees as a result of high-to-low debit card sequencing, as well as the corresponding amount of that harm.

16. As a result of these efforts, I identified the Citizens consumer accounts during the class period (January 20, 2006, through January 20, 2012) that were charged additional overdraft fees as a result of Citizens' high-to-low sequencing of debit card transactions.

17. I identified 64,088 accounts demonstrating impact resulting from Citizens' high-to-low debit card sequencing. I understand that the Settlement Administrator has sent class notice to the persons named on the accounts that I identified. I also understand that should the Settlement become effective, payments will be made to eligible persons consistent with the terms of the Settlement.

18. On May 9, 2013, I was granted the access rights necessary in order to connect remotely to the Citizens network, which included access to the class-wide data that was used in order to perform the full analysis. This data was pulled by Citizens employees and was then made available to me on the Citizens system where the analysis was performed.

19. The Citizens demand deposit accounting system is an online system that is designed for day-to-day processing, and not for the storage of large amounts of data. As a result, historical data that the bank considers relevant is periodically copied into their data archival system prior to being purged from the online system. So even though the data used in this analysis originated in the online system, it was all extracted from the data archival system into text-based reports. Once Citizens completed the extraction of all of the data necessary for the full analysis, that data was provided and contained the following reports:

   a. The Transaction Journal reports contained all of the transactions for all accounts for the entire class period.

   b. The Daily Trial Balance reports contained the daily account balances for all accounts for the entire class period.

20. Citizens' reports included the following relevant information for all of the customer transactions, including the overdraft transactions:

   a. The posting date of the transaction;

   b. The dollar amount of the transaction;

   c. A "transaction code," which identified the type of transaction;

21. In addition, the reports included the daily ledger balance and daily available balance.

22. With the available data from these sources, I was able to: (a) identify the specific customers who were affected by Citizens' high-to-low debit card posting practice during the class period, as compared to the alternative posting order where debit card

7

transactions are posted in low-to-high order based on the transaction amount; and (b) calculate the amount of such harm to each such customer.

23. My analysis consisted of the following steps:

a. The transaction detail was reviewed, and based upon the transaction code, overdraft fees were identified. This allowed me to identify all instances where a customer was assessed multiple overdraft fees on a given day.

b. For each instance where a customer was assessed multiple overdraft fees on a given day, using software code that I developed, I programmatically re-sorted the transactions to match the alternative posting order that I was provided, and calculated the number of overdraft fees that would have been assessed under the alternative posting order. Specifically, for the alternative posting order, I sorted all debit card transactions by transaction amount, from low-to-high, (as opposed to the original order of high-to-low), then all other debits left in the original order of high-to-low.

c. Next, I calculated the differential between the overdraft fees that would have been assessed to each customer under the alternative posting order and the overdraft fees that Citizens actually assessed under its actual posting order. I then added up the differentials for all of the customers to calculate the gross damages.

24. Through this analysis, I was able to identify the customers who would have had fewer overdrafts under the alternative posting order and the amount of the impact during the class period.

25. To measure accurately the damages for each customer, I applied methodologies to adjust the gross amount to account for "reversals" (where Citizens reverses the assessed overdraft fee); and (b) "uncollectables" (where the customer closes

8

the account with a negative balance and Citizens does not collect the assessed overdraft fee).

26. For reversals, the data that I was provided contained the amount and reversal posting date (*i.e.*, when the reversed amount was credited to the account) for overdraft fee reversals. The Citizens data did not indicate which overdraft fee reversals were tied to which assessed overdraft fees, making it impossible to determine precisely the impact of reversals on the additional fees charged as a result of Citizens' posting order. I thus used the "30 day" method to adjust for fee reversals.

27. Under the 30-day method, all overdraft fee reversals that occurred in the 30 days after any "differential" (*i.e.*, after any instance where the customer would have had fewer overdraft charges under the alternative posting order) were used to offset such "differential." If the overdraft fee reversals equaled or exceeded the "differential," then the customer was not considered to have been affected by high-to-low posting of debit card transactions. If the overdraft fee reversals were less than the "differential," then the "differential" was reduced by the amount of the reversals.

28. For uncollectables, I identified accounts that were closed after a write-off for a negative balance and were considered uncollectable. In such instances, I reduced the customer's total damage by the amount of such negative balance. If the remaining damage after this adjustment was less than or equal to zero, then the customer's damage was reported as zero.

29. For the class period, I identified a total of 64,088 accounts that were affected by Citizens' high-to-low debit card sequencing. I calculated the Differential

Overdraft Fees for each of the accounts, pursuant to paragraph 70 of the Settlement Agreement.  That information was then provided to Citizens.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of November, 2013, at Richmond, VA.

_____
ARTHUR OLSEN